Filed 9/6/13  P. v. Hartway CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C066249 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F06864) |
| v. | |
| RICKY HARTWAY, | |
| Defendant and Appellant. | |

Following a jury trial, defendant Ricky Hartway was convicted of two counts of robbery and one count of attempted robbery.  The jury also found defendant was personally armed with a firearm during the commission of these crimes.  The court sentenced defendant to an aggregate term of six years two months in state prison.  Defendant appeals, claiming instructional error and ineffective assistance of counsel.

We affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution's Case

Crystal Moore, assisted by her sister, Ashley, was looking to buy a car. She found a green Saturn on Craigslist being sold by a man named "Dwight Thomas." When Crystal called the telephone number listed, a woman answered; she said the car belonged to her boyfriend and he would call Crystal back. A man, identifying himself as "Dwight Thomas" returned Crystal's call and said the car was in working condition. After several calls back and forth, "Dwight" finally told Crystal to meet him in Rancho Cordova, off of Kiefer Boulevard, so that she could look at the car.

Crystal, along with Ashley, Ashley's son, and Crystal's friend Kayla, drove Ashley's car to a gas station near the meeting point and called "Dwight" again. After several calls back and forth, a woman answered "Dwight's" phone and gave Crystal further directions for meeting him. The women followed the directions and parked Ashley's car on the corner of Rosewood and Mojave, where they awaited further directions.

Several minutes later, a green Saturn pulled up across the street, approximately 60 feet away, and parked facing Ashley's car. Defendant was alone in the Saturn. Shortly after defendant parked, Aikon Suttles walked up to the car. He and defendant then started talking. The two spoke as if they were friends, and continued talking for three or four minutes. Ashley assumed they were selling the car together.

Crystal then received a call from a female who told Crystal to park behind the Saturn. Ashley drove down the street, made a U-turn, and parked behind the Saturn. By this time, Suttles had walked away from defendant.

The women then got out of Ashley's car and started looking at the Saturn. Defendant told the women the car ran "fine" but acknowledged that the engine was missing the "serpentine belt." Suttles reappeared and was now wearing shorts instead of the jeans he was wearing earlier. Suttles walked up to Crystal and defendant, pulled out a

2

gun, and pointed it at defendant's chest. Defendant did not react to the gun; he did not jump or take a step backward, or even appear to be scared.

Suttles yelled and cursed at defendant saying, "why are you trying to sell my car? Give me my keys!" Defendant replied, "I don't know what you're talking about." Defendant walked calmly away and stood across the street. Meanwhile, Suttles pointed the gun at Crystal's head and demanded she give him anything she had. He said, "I know you have money." He took the wallet from Crystal's purse and removed all the cash she had with her, approximately seven hundred dollars in $100 bills and $20 bills. When Crystal asked for her wallet back, he threw it back at her.

Suttles then pointed the gun at Ashley's head and told her to give him all her money. Ashley, terrified and shaking, took $10 out of her wallet. Suttles then asked Kayla what was in her pocket. She said cigarettes and he demanded to see them. Kayla handed Suttles the cigarettes; he threw them on the ground and ran away.

Defendant then came back, knocked on Ashley's window and asked, "What happened? Did he get any money?" Again, defendant did not appear to be scared or nervous. Instead, he had a "normal look on his face" and a casual demeanor. Ashley ignored him, and defendant drove away in the Saturn. Ashley followed defendant and saw the Saturn break down in the middle of the street. Defendant got out and began pushing the Saturn. A good Samaritan pulled over and helped defendant push the car out of the street, onto the sidewalk. Defendant then ran to the front of a house, where the victims lost sight of him. A few minutes later, defendant ran back into the street, a white Pontiac pulled up quickly, and defendant jumped in. There were two African-American women in the Pontiac, later identified as defendant's girlfriend, Ameerah, and his cousin, Tiana. The Pontiac, with defendant inside, sped away. The 911 dispatcher, with whom the victims were speaking, told them not to follow the car, and they complied.

A CHP air operations officer who was monitoring law enforcement communications from a CHP airplane saw the Pontiac through a high-power zoom

3

camera. He spotted the Pontiac leaving the area at a high rate of speed, which he estimated at over 45 miles per hour in a 25-mile-per-hour zone. He noted that the car made a rapid right turn without stopping at a stop sign. The officer testified he could not remember the street the car was on when he first saw it, but after looking at a map shown to him by counsel for Suttles, he said he would bet money it was Rosemont Avenue. The car did not stop from the time the officer first saw it until its ultimate stop at Montoya and La Quinta, although it slowed about halfway to that location, until it looked like a normal car traveling through a neighborhood. When the car stopped, he saw two men get out of the backseat of the car.

James Galovich, a Sacramento County sheriff's deputy, was dispatched to the area in which the crime had occurred. He was provided a physical description of defendant. Officer Galovich reached the area and located the two subjects. At trial, he identified them as defendant and Suttles. Defendant and Suttles were then taken into custody by sheriff's deputies.

Galovich found a black backpack on the ground next to the rear passenger tire of the Pontiac. He opened the main compartment of the backpack and found paperwork bearing defendant's name. Underneath the paperwork, he found a loaded, black .380-caliber Lorcin semiautomatic handgun. The deputy also found a parking ticket, a class schedule, and other papers bearing defendant's name in a zippered compartment. In a smaller compartment, which was also zipped up, he found a fee receipt in defendant's name and $350 in cash. There were three $100 bills, two $20 bills and ten $1 bills. Suttles had another $185 in his pocket -- one $100 bill, four $20 bills and a $5 bill.

### Defense Case

Defendant testified. He described his relationship with Suttles as, "[l]ike my little bro." Suttles lived with defendant's mother.

Defendant testified that his girlfriend, Ameerah, posted the car on Craigslist and set up appointments with potential buyers to see the car. He met the victims at Mojave

4

and Imperial, a location that is about two minutes from his mother's house. He sat in the passenger seat of the car until they arrived. As they were looking at the car, Suttles walked up. Defendant denied talking to Suttles at all that day up until this point. Suttles said to defendant, "What's up?" and then repeated, "What's up," this time more seriously. Suttles pulled a gun and pointed it at defendant. Suttles then turned the gun on the women as they started to walk away. Defendant ran away, sprinting north on Imperial.

Defendant went back to his car after about five minutes, but he took a different route back. He saw the victims in their car and Suttles was gone. He walked to the victims' car and knocked on their window to ask the women if they were okay, but they did not want to talk to him. He testified that he suspected Suttles had robbed them, but was not sure. Defendant drove his car away, leaving the victims because they would not talk to him and because he had "somewhere to be." He testified he was "concerned of getting to where I got to be, I got stuff to do." As he drove away, he noticed the victims were following him.

While defendant was driving away, the car stopped running. A man helped him push the Saturn to the nearby home of his mother's landlord. Nobody answered the door there, so defendant called Ameerah to come pick him up. He told Ameerah to pick him up there, even though his mother's house was around the corner. He knew the victims had followed him and were down the street watching, but he testified he was not worried about them calling the police. While he was waiting for his girlfriend to arrive, he called Suttles to find out where he was.

Tiana and Ameerah picked him up in Ameerah's mother's white Pontiac. They had plans to go to an air show. As they passed defendant's mother's house, defendant saw Suttles coming out. Defendant told Tiana to stop so they could pick up Suttles. Suttles was not going to the air show with them. When asked why he told Tiana to stop to pick up Suttles, defendant said, "I don't know cause my little brother -- my little bro.

5

I was telling them to stop. I would have told them to stop if I had seen him anywhere regardless. I would have stopped for him." Defendant suspected Suttles had robbed the victims, but said nothing about it. After Suttles got in the car, they went to Ameerah's sister's house at La Quinta and Montoya.

Earlier that day, defendant had left his backpack on the back right passenger seat floorboard of the car and it was there when Ameerah and Tiana picked him up. Defendant testified that when they got to Ameerah's sister's house, defendant got out of the car, but returned to retrieve a phone. When he returned, Suttles told defendant that he had put a gun in defendant's backpack. Defendant took the backpack out of the car because he did not want the children to get into it. He dropped it when he saw the police coming straight for him. Defendant was then arrested. Defendant testified that he did not participate in the robbery.

On cross-examination by the prosecutor, defendant denied that anybody walked up to him after he parked the Saturn and waited for the buyers to arrive. On cross-examination by counsel for Suttles, defendant testified that Suttles did not walk up to him and they never had a conversation during that time. He never told Suttles he was selling the car.

On cross-examination by the prosecutor, defendant said he was surprised to see Suttles when he showed up. When Suttles pointed the gun at him, defendant raised both hands and jumped back, visibly frightened.

On cross-examination by the prosecutor and counsel for Suttles, defendant testified that Tiana did not drive up quickly when she and Ameerah picked him up, and she did not speed away. He said the car traveled at a normal rate of speed.

On cross-examination by counsel for Suttles, defendant testified that after Tiana picked him up at the home of his mother's landlord on Imperial, she drove up to Mojave, then turned left onto Rosemont and right onto Autumnwood, where his mother's house is located. There, they picked up Suttles. Defendant said that if the CHP air officer

6

testified the Pontiac drove down Rosemont and did not stop until it got to Montoya and La Quinta, that testimony would be wrong.  He also said the car did not run any stop signs on the way.

At trial, the jury was instructed on the elements of aiding and abetting.[1]  During deliberations, the jury asked the following question:  "Clarification of Instruction 401 – the location of 'and' in the instruction.  Do all 4 need to apply, or just 3 and 4?  Also, at what point is a crime 'OVER.' "  The trial court responded:  "Regarding Instruction 401, the conjunction 'AND' applies to all four prongs, i.e., all four must be proven by the People beyond a reasonable doubt.

"As to when a crime is 'OVER,' as to robbery, please see Instruction 1603 relating to reaching a 'place of temporary safety.' "[2]

---

[1]  CALCRIM No. 401 reads:  "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:  [¶]  1. The perpetrator committed the crime;  [¶]  2. The defendant knew that the perpetrator intended to commit the crime;  [¶]  3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;  [¶]  AND  [¶]  4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.  [¶]  Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.  [¶]  If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.  [¶]  If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.  However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him an aider and abettor."

[2]  CALCRIM No. 1603 reads:  "To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety.  [¶]  A perpetrator has reached a place of temporary safety with the property if he has successfully escaped from the scene, is no longer being pursued, and has unchallenged possession of the property."

Ultimately, the jury found defendant guilty on all counts.  The jury also found true the allegation that defendant was armed with a firearm during the commission of his crimes.  The court subsequently sentenced defendant to an aggregate term of six years two months in state prison.

**DISCUSSION**

Defendant contends the trial court erred "by failing to fully instruct the jury on the point at which a robbery ends for purposes of an aiding and abetting theory of culpability."  Specifically, defendant argues that when the jury asked the court to explain when the crime had "ended," the court should have done more than refer the jury to CALCRIM No. 1603.

Defendant argues that while there was nothing "affirmatively erroneous" about what the court told the jury, "the court's instruction was erroneous by omission," because it "failed to instruct the jury that 'a place of temporary safety' has a contextual meaning, namely, safety from the victims who may seek to recover their property."  He further argues that "common sense" and the logic of differentiating between aider and abettor liability and accessory after the fact liability dictates that the place of temporary safety refers to safety from the owners, not safety from the police or other third parties.  Defendant contends that Suttles had already reached a temporary place of safety at defendant's mother's house where they picked up Suttles, and the escape from pursuing police officers has no bearing on the temporal duration of the robbery.

However, defendant did not object to the trial court's response to the jury's inquiry.  Thus, defendant is barred from arguing on appeal that a more elaborate response should have been given.  (*People v. Medina* (1990) 51 Cal.3d 870, 902; *People v. Christopher* (2006) 137 Cal.App.4th 418, 427.)  If defendant wanted a more detailed response, he should have proposed one in the trial court.  (*Medina*, *supra*, 51 Cal.3d at p. 902.)

Defendant's additional contention, that trial counsel was incompetent in not proposing a more detailed response to the jury's inquiry, also fails.  To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).)  " 'Surmounting *Strickland's* high bar is never an easy task.  [Citation.]' " (*Harrington v. Richter* (2011) ___ U.S.___, ___ [178 L.Ed.2d 624, 642 (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, ___ [176 L.Ed.2d 284, 297].)

The reason why *Strickland's* bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.  [Citation.]  . . . It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'  [Citations.]  The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.  [Citation.]" (*Richter*, *supra*, ___ U.S. at p. ___ [178 L.Ed.2d at pp. 642-643].)

To establish prejudice, "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, ___ U.S. at p. ___ [178 L.Ed.2d at p. 642].)  To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694; accord, *Ledesma*, *supra*, 43 Cal.3d at p. 218.)

Defendant argues on appeal that the jury's question indicated the jury was leaning toward a finding that defendant did nothing more than help Suttles escape; thus making defendant guilty only of being an accessory after the fact. We disagree. We can read nothing more into the jury's note than that one or more jurors had the questions that were posed. We reject the contention that we can determine what the entire jury was thinking based on a jury question.[3]

We observe that defendant has not suggested language for the instruction he contends should have been proposed at trial by trial counsel. The failure to do so is telling on the first prong of the ineffective assistance of counsel test. It is defendant's burden to establish both prongs of the analysis. If a nonargumentative instruction cannot be proposed here, we cannot conclude that trial counsel was deficient for not having done so.

Moreover, the concepts that defendant suggests a clarifying instruction should have covered are not supported by the authority upon which defendant now relies. Indeed, there is no authority directly supporting what defendant now proposes in concept. Trial counsel was not incompetent for failing to divine a new and unique legal theory, not supported by precedent, instead of allowing the court to tell the jury that the answer to its question could be found in the standard instruction. As a matter of common sense, an attorney is not required to raise a novel argument or raise objections which could only be

---

[3] We also reject defendant's attempt to establish prejudice through the declaration of counsel relating what a single juror purportedly said concerning the deliberations. The declaration is inadmissible hearsay. (Evid. Code, § 1200.) And even if it were not hearsay, it is well settled that Evidence Code section 1150, subdivision (a) prohibits courts from considering evidence of a juror's subjective reasoning process. (*People v. Steele* (2002) 27 Cal.4th 1230, 1261 [verdict may not be impeached by inquiry into a juror's mental or subjective reasoning processes, and evidence of how a juror understood the trial court's instructions is not competent].) Appellate counsel's attempt to persuade us with this clearly inadmissible evidence is inappropriate.

10

sustained by cases yet to be decided. (*In re Richardson* (2011) 196 Cal.App.4th 647, 661; *In re Woods* (1966) 64 Cal.2d 3, 7-8.)

Defendant relies primarily on *People v. Cooper* (1991) 53 Cal.3d 1158 (*Cooper*). In *Cooper*, the defendant drove the two codefendants to the parking lot of a shopping center. After parking the car, the three alighted and conversed a short while. At one point, defendant walked over to a wall, looked over the top and returned to the car. Several minutes later, the codefendants ran across the parking lot, slammed into an elderly man and stole his wallet. They then fled back to the car, jumped in, and defendant hurriedly drove them away. (*Cooper*, *supra*, 53 Cal.3d at p. 1161.) The Supreme Court concluded that the trial court's instructions improperly tied the duration of the robbery to the concept of escape. The instructions permitted the jury to conclude that a getaway driver, who has no knowledge of a robbery until the robbers enter the getaway car, is liable as an aider and abettor even if the robbers he transports are not carrying away the loot during the escape. (*Cooper*, *supra*, 53 Cal.3d at p. 1161.)

Our high court held, "The asportation, the final element of the offense of robbery, continues so long as the stolen property is being carried away to a place of temporary safety. Accordingly, in order to be held liable as an aider and abettor, the requisite intent to aid and abet must be formed *before or during such carrying away of the loot to a place of temporary safety*. Therefore, a getaway driver who has no prior knowledge of a robbery, but who forms the intent to aid in carrying away the loot during such asportation, may properly be found liable as an aider and abettor of the robbery." (*Cooper*, *supra*, 53 Cal.3d at p. 1161, italics added.) The court concluded that the trial court's erroneous instruction was harmless, because the carrying away of the stolen property to a place of temporary safety coincided with the escape in that case. (*Ibid*.) The court said nothing that would suggest a "place of temporary safety" excludes places to which pursuing police might track the perpetrators and is instead limited to places that

11

are safe from victims who may seek recovery of the stolen property. *Cooper* does not support defendant's novel theory.

Defendant also relies on *People v. Fields* (1983) 35 Cal.3d 329, in which the jury was instructed with former CALJIC No. 915, as modified by the court, which read, " 'A robbery is complete when the perpetrator . . . has reached a place of temporary safety and is in unchallenged possession of the stolen property after having effected an escape with such property.' " (*Fields*, *supra*, 35 Cal.3d at p. 364.) In *Fields*, the victim was at the defendant's residence when the defendant compelled the victim by force to write a check, which was then cashed by the defendant's sister and given to the defendant. Thereafter, defendant and his sister drove the victim away from the residence and killed her. The court wrote, "We recognize that when [defendant's sister] returned with the proceeds of [the victim's] check and gave them to defendant, he had control of the robbery proceeds in his own residence. That residence, however, was not a place of safety so long as [the victim] was held prisoner. [Citation.] In an unguarded moment, she might escape, *notify the police, and render the* [*defendant's*] *residence quite unsafe for defendant*. In order to complete a successful escape with the robbery proceeds, defendant either had to dispose of her, which he did, *or flee to some other* place *which she could not identify for the police*." (*Fields*, *supra*, 35 Cal.3d at pp. 367-368, italics added.) Thus, as can be seen by the italicized language, our high court has not limited a place of temporary safety to some place that is safe from a victim's attempt to recover the property. Rather, it also contemplates a place where the loot is taken that has not been identified by the victim to the police. Logically then, a location cannot be a place of temporary safety if identified by pursuing police through their own efforts. A place to which a robber has fled with the proceeds, which is identified by pursuing police, can hardly be characterized as a place where the robber has temporarily escaped and has unchallenged possession of the property. As there is no persuasive authority supporting the proposition that the jury

12

should have been instructed as defendant suggests here, counsel was not incompetent in failing to request such an instruction.

Furthermore, even assuming a nonargumentative instruction conveying the concepts defendant now suggests could be authored, defendant has not shown prejudice, as he has failed to show a reasonable probability he would have received a more favorable result had such an instruction been provided to the jury. The evidence is compelling that defendant knowingly took part in a ruse designed to rob the unsuspecting victims of money they brought to purchase the Saturn.

## DISPOSITION

The judgment is affirmed.


                                                                    MURRAY          , J.



We concur:



          RAYE          , P. J.



          DUARTE          , J.


13